cetera. May it please the Court, Larry Orlansky representing Appellant and Third Party Defendant Roger Porter. Your Honors, we rely on our briefing as to the Summary Judgment Ruling dismissing Mr. Porter's claims, and I will address the District Court error in denying the motions to remand for my ten minutes. Ms. Brown, who represents Mr. Ashford, will address certain aspects of the Summary Judgment Ruling. We reserve five minutes for rebuttal. Because there is no settlement agreement between the plaintiff, Ashford, and the non-diverse defendant, Aeroframe, the motions to remand should have been granted, and the case should have been remanded to State Court. To explain, I want to address two principal issues for the Court to consider in its de novo review of this remand denial. First, the District Court erred in using a theory of realignment of the parties after removal in order to create diversity jurisdiction where it did not exist. Doing so under the circumstances of this case in particular ignores the well-established tests and safeguards that the Court has developed for analyzing whether a non-diverse party is present solely to prevent federal jurisdiction. Second, the District Court's decision here to realign hinged upon legal error in concluding through assumptions that Ashford, the plaintiff, and the non-diverse defendant had settled Ashford's claim when, under Louisiana law and based on the record evidence, there was no settlement. If there were a settlement, we wouldn't need to, you wouldn't need realignment doctrine. Caterpillar would say that any problem had been cured, right? Well, that's correct, Your Honor. Had there been a settlement, an actual settlement, a dismissal, which you would expect in a voluntary settlement, that would fit cleanly within one of the two fundamental tests that we have for testing whether someone is present for the sole purpose of destroying federal jurisdiction, in this case, the voluntary-involuntary rule. Clearly, had there been a settlement . . . And there's no case law that extends Caterpillar to, say, the functional equivalent of? So could you, could parties settle but just not submit that to get that final dismissal so as to maintain jurisdiction? Well, had that happened, which there's no record evidence here that that had happened, I guess that would be a different inquiry. Do you know of any cases that . . . Well, we cited the Landry case with Judge Barbier in the Eastern District. And he was confronted with a situation in which he . . . The contention was that there had been a settlement and that the non-diverse party was out and the court had jurisdiction. He says in his opinion that he had lingering concerns as to whether, in fact, there was a settlement, but the record evidence was that there was not a binding, enforceable settlement under Louisiana law. And if I have the right case in mind, I believe he walked through Civil Code Articles 3071 and 3072 to say, you know, under Louisiana law, you need a written binding enforceable agreement or stated in open court and said, look, I have a sense that this thing may have settled, but I don't have it in front of me and I'm not going to . . . What about the somewhat convincing explanation that under the ultimate interest test, realignment would be appropriate here? Well, the reason why I referenced an intrusion on or ignoring of our traditional rules would be, if you had realignment in the sense that this court has discussed it, which typically is in a case filed in federal court where the court, of course, has the obligation and the authority to always question its jurisdiction. In that instance, you're looking at the field of play, if you will, as it exists when the suit is filed. I've seen no realignment case, even the cases cited by our opponents, where they suggest that realignment would be appropriate on removal. I've seen none where the analysis deals with subsequent case developments. In other words, sure, you assess the field of play at the time the suit is filed. You may not do that assessment until down the road when somebody files a motion, but you look back and say, okay, when you filed suit, you had a bona fide dispute with that nondiverse defendant. Now, things have happened over the course of a case, as happened here, where Roger Porter, my client, was not a party at all. He gets third-party in. There become cross-claims and counterclaims, and all of a sudden ATS says, well, wait a minute. Here we are seven months down the line. We're having depositions. The law allows that, though. The law allows. The statute allows that within one year, right? It does allow within one year if there has been some act from which you can ascertain that the matter has become removed. Do you think that email had any influence on the removal? It certainly is what they relied upon, Your Honor, but we don't think it validly creates it. Well, I guess what I was alluding to in response to Judge Higginson's question is that these subsequent developments down the road where it said that parties who now have been made targets of another party, in this case ATS, are somehow colluding because they're actively dealing with the ATS claim, but at the same time the plaintiff still has his claim against the nondiverse defendant. The fact that the litigation is ratcheted up, if you will, because of those claims. Well, let me just ask you a question, though, and I forgot when you were stating who was going to say what at the beginning of the case. Which one of you is going to argue that you're not liable for sanctions? Well, I believe Ms. Brown. Frivolous duplicate of appeals. Well. Okay. I just want to make sure one of you is going to address that. Well, on that, Your Honor, I would just say that what they refer to as duplicative appeals, in the first two instances were requests for certification under Section 1292, and I know Your Honor is familiar with what happened there, but the ultimate, the second one, simply was exercising discretion not to take the appeal. The third appeal was a result of a summary judgment that my client Porter was not involved in, but it was certified under 54B, and the parties took the appeal. And it's consolidated now with this appeal, which my client directly took. So I would urge the Court to consider that that's not for appeals from the case, but it's not a sanctionable or egregious appeals. Do courts assess complete diversity at the time of removal as well as at the time of filing? Yes, you assess it both at the time of filing. So, in other words, if the realignment doctrine exists, and it seems to me they've cited law that says it does, Peters, still when a district court's going to say interests have now fully aligned, there's no adversity, it has to be tracing it back to that alignment existed at the time the suit was filed in state court? Is that your position, and do you think that's the case? Yes, sir. I believe it's clearly the case, and even in Peters, which is a decision that hasn't been cited in any of the subsequent jurisprudence, but even that case involved a scenario where the assessment was made as of the time of filing. It involved a co-lessor. It's a very short opinion, as you know, so it's hard to tell the facts, but my gleaning from it is it's a mineral lessor who's suing to cancel the lease, sue Standard Oil, and also her co-lessor. It's almost as if it's a nominal party situation that she needs to name that co-lessor because she's looking to cancel the lease. In that sense, on the day the suit was filed, one could say comfortably, well, the claim against Mr. Lindsey, I think is what the name was in that case, is really it's a nominal party situation. That's a test that we are accustomed to. It's a party as to whom we don't expect any recovery, and we're not really pursuing a claim because we just had to name them pro forma. And that's what Peters involved. Now, what's interesting is three years before that, in 1946, the Texas Pacific case that we cited, the court addresses realignment in the context of a case filed in federal court, and there the court said facts forming the basis for realignment must exist at the time of filing the original suit. Your Honors, we cannot have in complex, ongoing, multi-party litigation a scenario where we're going to constantly reassess who's siding with who on various issues and say, well, I'm going to remove the case 11 months and 15 days after a suit was filed because now, even though plaintiff and non-diverse defendant have a valid claim as between each other, their real fight is in this bigger thing in the third-party demand. That's ignoring the realities of multi-party litigation. I see my time is up for the 10 minutes. All right. Good afternoon. Summer Brown on behalf of Mr. Ashford. And I'll just start, Judge Jones, with where you asked about the sanctions issue. And I'll tell you this was an odd appeal for us to take because, first of all, we're appealing from the denial of a motion for summary judgment, which is not the typical way that we get to you guys. We are not you guys. I am willing to accept a lot of colloquialisms, but for the court, we are the court or your honors. And I apologize. Yes. As far as the discretionary review issue, we did attempt to get to this court on two separate occasions through that process, and we declined the opportunity to do that. And so once we had a judgment entered, and although that judgment was a denial of summary judgment, the district court certified that judgment as final, and at that point we had no issue but no opportunity other than to take it up or to lose the right to do so. And so there was nothing in bad faith about the appeal in any way, and we thought that it was the only action that we could take. It seems to me that you're briefing on appeal on the summary judgment issues. It's very scanty. With respect to which motion, Your Honor? The summary judgment. Well, there are two, and that's right. I think that with respect to Mr. Ashford's motion, the briefing is difficult because the issue truly is jurisdictional. I think that the ruling that resulted from Mr. Ashford's motion for summary judgment, the court had to find that Mr. Ashford didn't have a claim and denied his claim as moot because the court is not able, the district court was not able to rule on that motion because it was a claim between two Louisiana parties. And any ruling, any substantive ruling would have been a nullity, and it would have inherently recognized that jurisdiction did exist. Saying that there was a compromise unfortunately does not make it so, and there has not been a compromise of any of these claims. And right now, Mr. Ashford and more than a hundred of his colleagues, whose cases are stayed pending the outcome of this appeal, they're without any place to go to get resolution. I think they ought to go against Mr. Porter and against Aeroframe. Well, they have asserted a claim against Aeroframe. That's correct. I think they ought to go against Mr. Porter. Well, at the time that we filed suit, and again, with respect, while I'm not talking about jurisdiction, I think it's just inherent and underlies everything that we're here about. With respect to Mr. Porter, when these 104 people came to my office, I did not believe they have a claim against Mr. Porter. I believed that they had claims for their two weeks of earned but unpaid wages under the Louisiana last paycheck law against their employer, and we filed those claims. At that time, I had no way to know that ATS was going to then later assert claims against Mr. Porter and bring him into the litigation and assert claims between Aeroframe and ATS. I knew what ATS had done, and I asserted claims against ATS, but I had no way of knowing Roger Porter was ever going to be brought into this litigation. Even if this law has been criticized, isn't it the law in our circuit that the amount of controversy could be met by the counterclaim? Yes, I believe that that is true. So the realignment, and we didn't do a lot of discussion about the amount of controversy. It's not met as to Mr. Ashford's claim. But if the law allows the counterclaim amounts to be included, then it would be met. That's right. So are you not pressing? We didn't focus on that issue, and it's also not the same as to all 104 of our clients. I think the real issue is with the diversity. And so with respect to Mr. Ashford's motion for summary judgment, I think it is just subsumed by the jurisdictional question. Now, with respect to the ATS motion, and I'll be quick, but the record is replete with references to record evidence, sworn testimony by corporate representatives of this company, in fact, and the district court said that we relied on nothing but conclusory allegations. But yet it's ATS's own testimony that proves several things that at a minimum raise a fact question about the unfair trade practices, and I'll just quickly run through a few of those. But ATS knew through confidential dealings about Aeroframe's dire financial situation. They knew about the ability to negotiate this large debt down. They had two opportunities to do a deal themselves with Aeroframe, declined to do so to wait Aeroframe out, and then as soon as they knew Aeroframe was doing a deal with someone else, they came in behind Aeroframe's back and bought that debt, foreclosed on it, and accelerated it. By doing so, they decimated the deal between Aeroframe and AAR not to their own benefit. I'm not seeing the amount of time. I'm sorry. Okay. Mr. Bileau? Yes, Your Honor. Your Honors, Lawrence Bileau on behalf of Aeroframe Services LLC. May it please the Court. I think important to bring to your attention, I think you all, the Court sees this quite often, and that is that cross-claims always have a mechanism of aligning and not aligning parties in different phases. We can agree on certain issues. I don't agree with Michael Ashford's evaluation in that summary judgment should have been. What do you not disagree with in Mr. Porter's position? What do you disagree with? Well, with the evaluation, I don't believe that summary judgment should have been granted against Aeroframe Services LLC in reference to the valuation of Michael Ashford's claim. We don't dispute that all of these plaintiffs are owed some value in funds. One of the issues is, and the reason I perceive that summary judgment is inappropriate is because there are equitable defenses. The question is, why was Aeroframe unable to pay the debts? Were the actions of ATS part and parcel of the reason that these employees were not paid? I think that those are equitable defenses. I think it can address the issue of penalties and attorney's fees. The second part of it is there is no evidence in the record regarding the financial records of Aeroframe in reference to the money that was actually owed to each of these employees. And let me explain. Michael Ashford filed two affidavits into the record alleging that he was owed money, but the records themselves are contained in computer systems that were seized by ATS. So I could not come before Your Honors and affirm and attest to an amount that I could agree each employee is owed because we are not in possession of those records. Is it ascertainable with future discovery? I believe it absolutely is, but I don't have that. The other part of it is, going back into these cases, is each one of these different matters. I think that Aeroframe is in a different position than Mr. Porter. I think Mr. Porter has a defensible position on whether or not he is liable for the attorney's fees. Aeroframe does not. Aeroframe owes whatever wages are due. So we need the opportunity to present that. So I think in that respect, the motion for summary judgment was improper because I think there's an arguable basis that there's a dispute of material fact. The other issue is, I think is brought up by Ms. Brown, and that was all of the remaining plaintiffs' cases hang in limbo. I don't, my client does not have a final judgment. It says the rulings are that the position relative to jurisdiction is moot, and I submit to Your Honors that jurisdiction is not moot. At the time that the claim was filed, Michael Ashford was a citizen of Louisiana, and so was Aeroframe. And that was at the inception of the lawsuit. That's how all this started. We got to federal court because ATS filed cross-claims. Hence, my alignment as an appellee when, in some respects, I'm aligned as well with the appellants in this matter. I think that it would be remiss of me not to point out the issues relative to Civil Code Article 3071 and 3072 here in Louisiana, which requires that a settlement agreement relative to apply the theory of realignment has to be in writing and are recited in open court. Otherwise, it's not a binding position. And it is fully understandable that Aeroframe wants to pay these employees money. They were employees that worked for Aeroframe. But they also don't have the money to do it, and they're not going to bind themselves to do something. I mean, who is they? Aeroframe would like to pay its employees. But I thought Aeroframe's out of business. It is out of business. But if it were to prevail in a claim under the Unfair Trade Practices Act and it receives funds, it would like to pay its employees. Those were individual. How could it possibly receive anything? I assume Mr. Porter was the chief executive officer? Yes. Okay. How many exclusivity agreements and employment overtures did he violate? Your Honor, I'm not familiar with that. I don't know. Candidly, I came into this on appeal. I read the record. I was not trial counsel, and I did not. Ma'am? Who's paying you? I was asked by Bray Williams to come in and stand in because they were stuck in a position. I have not been paid, Your Honor. Bray Williams is a friend of mine. And they filed a motion to withdraw both in a district court and in the appellate court, and they were left in an untenable position of being granted an out in the court of appeal, but they're still counsel of record in the district court. So it's a tough position. I've had a lot of cases with Mr. Williams, and I was asked if I could step in and make sure that their client's taken care of. So to answer your question, I've not been paid by anyone. All right. Thank you. Thank you. Good afternoon, Your Honors. Patrick Vance on behalf of Aviation Technical Services. The arguments offered by the plaintiffs wants the court to ignore three really significant facts. Number one, they want you to ignore the e-mail, what I call the Summer Brown correspondence, as though it is not evidence, and it is evidence, that there was a settlement with Aeroframe. They also want you to ignore the bombshell admissions that Mr. Porter made in that Tennessee federal court case that we found that completely refute the primary allegations of the claims of all of the plaintiffs, that ATS's purchase of the EADS note caused the closure of Aeroframe and the loss of Mr. Porter's employment package. And thirdly, they want you to ignore the simple fact that Mr. Porter is the sole owner and the sole spokesman of Aeroframe, which is a defunct corporation. And once you use your common sense and you pierce through the pleadings and acknowledge, as Mr. Porter admitted in the Tennessee litigation, that he voluntarily shut down Aeroframe so that he could receive the $1.25 million employment package from AAR and that Aeroframe, that so-called separate and distinct entity, received absolutely nothing in return for that shutting down of Aeroframe and is now totally defunct, you can draw no conclusion other than that Aeroframe is totally aligned with the plaintiffs because its sole voice is solely Mr. Porter. And Porter admitted in … To have federal jurisdiction, wouldn't you have to prove that that alignment existed at the time of filing? I don't believe so, Your Honor. I think that the law in the Fifth Circuit is upon removal, you realign, and then you look at diversity to establish diversity jurisdiction. That's a 1949 case that the other side wants to dismiss, but it is good Fifth Circuit law. And it makes sense, too. Look, I mean, I'll just quote the case that they cite, Curry v. Pratt. Quote, in cases removed from state court, diversity of citizenship must exist both at the time of filing and at the time of removal. You know, I don't remember the exact facts of that case, Your Honor, but I think realignment is generally an exception to the rule of when do you look at what is the diversity of the parties involved. If that were true, that would be very significant for me. Do you offhand have a case or do you think it's in the briefs? I believe that it's in the briefs, Your Honor. Why doesn't Ashford have a claim against Aeroframe, both Louisiana residents? Well, number one, Your Honor, it does have a theoretical claim. I don't deny that. The law of realignment, though, is not that there can be no claim between the realigned parties. One of the cases that we cited in our brief where the court realigned the parties, there was a claim as between plaintiffs of over a million dollars. And the court said you look at what is the substantial primary dispute that is at issue, not the minor issues, to determine whether or not you can realign. And so the fact that Aeroframe may have some potential liability to the plaintiffs. They're the employer. They're the principal party that would be liable to him. Isn't that right? Yeah. Well, I think Judge Jones had it absolutely right. You know, if the employees knew what Mr. Porter admitted in the Tennessee litigation, they should have sued Mr. Porter. Mr. Porter voluntarily shut down this business. He closed the doors on Aeroframe. He was the sole owner. He did it for his own personal benefit. I think it's really a pretext to argue that these are separate companies, you know, that really should be treated separately for diversity purposes. I think it's very clear. You know, if you look at the Summer Brown correspondence, what is represented in the waiver is that Mr. Porter will, if any money he receives or Aeroframe receives from ATS as a result of this claim, then he'll pay that first to the employees. So he speaks for Aeroframe. Summer Brown does say that. But then when that was presented to the magistrate, the magistrate said that shows there's been an alignment as of now but rejected explicitly the collusion argument back to the date of filing. So that would come back to my concern if the law is binding that it has to be shown complete diversity at both inception and removal. The magistrate made a factual finding that it hadn't been shown at the outset. I think the magistrate, quite frankly, Your Honor, threw the plaintiffs and the lawyers a bone by not finding there was a fraudulent. I agree. But I think that the case I cited to you and a lot of cases discussed by Wright and Miller say that that little bone could be determinative, having not said that the alignment existed at the outset. Well, they weren't a party. Well, Aeroframe was a party. Porter was not a party. But, Your Honor, I think that you look at removal, and when you remove the case, you know, who was on which side of the V? The original case was Ashford v. Aeroframe and ATS, right? Right. Yes, Your Honor. Okay. But then ATS counterclaims and it impledes Porter, right? So I thought removal jurors, quote, inception of the case means inception of that case with the counterclaims. I think that ---- Right? I mean, because that's what triggered the time frame within which removal occurred, wasn't it? Yes, but, you know, in some instances in realignment, the other paper exception, you know, allows removal based upon events that happen post-removal. But I still think we'd be closing our eyes to suggest that at any point, Porter and Aeroframe were not the same thing. To me, it's not a matter of proof. It's a matter of ---- Common sense, Your Honor. Common sense under these circumstances. But Porter and Aeroframe are Louisiana citizens. Yes. Yeah, but if you align them with Ashford, then there's diversity with ATS. I want to point ---- Which is what was done. Yes. You're not relying on the Caterpillar, then, exception? This is a realignment case and you see a distinction between those two? Yes, Your Honor. There is no reliance on the Caterpillar? Yes. Yes, Your Honor. You know, when we removed the case, there were us on one side, Porter, Aeroframe, and the employees on the other side. And at that point, I think the Court can say, based upon the settlement agreement that Aeroframe was a nominal defendant and really should be treated as a plaintiff based upon their counterclaim against ATS, which was you screwed the deal and I lost my, you know, I lost ---- I understand that point. And I also see quite convincingly your argument that the e-mail reiterates that. At that point, Aeroframe is saying, we will pay you not just the attorney's fees but the penalties and the, you know, the whole kit and caboodle. But it would all turn on the question that we, the three of us, were just discussing whether you would have to have shown that at the inception and the magistrate's own finding that it didn't exist at that point could be consequential. Well, I mean, worst case, Your Honor, remand me back. I'm not asking for that. Remand me back and let me do discovery because I think that when you look at the complaint, you know, use your common sense. Mr. Ashford is, I believe, an airplane mechanic. He knew an awful lot about this case, about the business issues that you would not expect an airplane mechanic to be able to tell his lawyer to put into a petition. You know, Mr. Porter, his initial appearance was pro se. The magistrate noted that this was an awfully sophisticated pleading that Mr. Porter presented. It's as though he must have had a lawyer working with him. I think if you use your common sense ---- That's true. And it could be, you know, but at this point, you are a pele here. You are not appealing that magistrate's bone. That's right. That's right. I want to point out a couple of things that I heard in the arguments of the three parties that got up here. I think that Mr. Olansky said that on the third appeal that Porter was not involved, and that's the motion for summary judgment that Ashford filed and the motion to dismiss that Aeroflame file that caused the third appeal. Well, that's not exactly accurate because Mr. Porter filed an affidavit in support of the motion to dismiss that Aeroflame file. So Porter has been involved. He's ---- You can't separate Mr. Porter from Aeroflame. And just kind of, you know, really, this happened? Ashford, whose law firm represents Mr. Porter as well as the employees, they attacked Mr. Porter's affidavit. I mean, that's, you know, that's creating split personalities that I think really defies common sense that you should treat Aeroflame and Porter as separate parties here. I think that the whole claim against Aeroflame was put in the original petition to defeat diversity. It was designed to defeat diversity. And I think that if we had never come across this email, you know, we wouldn't be standing here. I was kind of surprised by Mr. ---- Is Aeroflame a defendant in the other 15 cases or whatever it is, cases that are pending? Yes, they are. Yes, they are. And was this more of a test case on your part to remove this one? I think that's the way the magistrate has treated it, Your Honor. Did you file removal notices? I did. Yeah, I did. And the magistrate, you know, decided to take one case and ---- How much are they asking for in total? Well, you know, it's kind of unclear from the complaint, and that's why we said jurisdictional amount was met. They asked for damages under Louisiana Civil Code Article ---- I mean, if you talk about all the employees, I mean, that must be a lot of money that they think they can get out of ATS. I believe so. I mean, it's at a bare minimum, it's two weeks of salary, and who knows how much in terms of future salary because some of these employees did not get hired by the new owner, and so they were out of work for a longer period of time. And so they also, besides Louisiana Civil Code Article 2315, they sought damages under intentional interference with contract and under the Louisiana Unfair Trade Practices Act. And under that statute, they're entitled to legal fees. And I just want to make it clear, the fact that their argument has been made, well, the amount that it can be recovered under legal ---- for legal fees, that's just not correct. I mean, you could ---- you know, they ---- you know, look, we spent $700,000 to be standing here today. I don't know what they've spent, although one of these ---- I may have misheard, but I thought they virtually conceded the amount in contrariancy today saying that Porter's counterclaim would count, where you're over $75,000. I heard that, too, but that's not what the briefs say, you know. But I was going to say, I was kind of surprised by Arrowframe's counsel's argument because they didn't appeal the summary judgment. I mean, he stood up here and argued that, you know, the summary judgment was wrongly decided and that if Arrowframe recovered, they would have assets to in turn pay the employees. Well, they didn't appeal it. And the reason they didn't appeal it is because they clearly waived it. And Mr. Porter was the person who signed the strict foreclosure agreement that waived anything with respect to the purchase of the note, the foreclosure on the property, the deal, the whole deal. And, you know, quite frankly, if you use your common sense, you would say Porter has also waived any kind of claim against ATS. But, you know, if you look at counsel's 19-page brief, you know, 17 pages are taking the side of Porter and Arrowframe with respect to jurisdiction and two pages, you know, two pages are, you know, an attack. I said that wrong. So 19 pages against my client and two pages in favor of jurisdiction on ATS's position. So I still messed that up. Arrowframe's 19-page brief with the exception of two and a half pages is an attack on jurisdiction. Thank you, Your Honor. I didn't want anyone to think that I was avoiding the Summer Brown email, considering that I'm the one that wrote it. Was it inartful? Yes. Was it nefarious? No. Unethical? I believe quite the opposite. It was actually drafted. And while this isn't evidence, it's been the source of this jurisdictional question. This was drafted really after we had consulted with Ethics Council. And, you know, I say inartful. It was written to, as Mr. Vance pointed out, a bunch of airplane mechanics. It wasn't intended to be, you know, scrutinized from a legal standpoint. But nowhere does it say anything about a settlement. What it does say and what the waivers and what Mr. Porter's agreement with my office say is that Roger has agreed to stipulate in writing that our clients will be paid first out of any monies that ever get collected. Is Roger paying the bills? He is not. I don't have any agreement with Roger. I mean, I have a contingency agreement with a bunch of employees. So no, I don't believe anyone. I assume that Roger will also pay those bills. But you aren't here disputing the accuracy of the e-mail. The two parties are cooperating. No, I'm not. And AeroFrame will pay, as they've stated here. I'm not. So isn't the legal question just that does realignment allow for an assessment in federal jurisdiction at time of removal? Or does it also have to return back? And I believe that it's both. Otherwise, and it's at the inception of the lawsuit. Otherwise, the court is opening. What is the date of inception that you're talking about? At the time of filing is the way that the removal. But that can't be the law. Because when you can implead a defendant two years into the case, and if there is diversity, the defendant can remove, right? Yes. The problem is when a defendant is allowed to assert claims to manipulate diversity, which has been done here, incidental demands and things of that nature. Which it seems to me, under the circumstances, were not surprising and they should not have been anticipated. Well, it was anticipated, quite frankly, that Roger Porter would be brought in. We had no way to know that they were going to individually third party. They found out what happened in Tennessee. And perhaps that is the case. But we had never hidden the fact that we had talked to Roger. Obviously, an airplane mechanic didn't know all the facts that are in the petition. We live in a small town. We picked up the phone and said, you know, we're going to be suing you. Okay. Well, your time's up. Thank you. Your Honor, it's just to be clear in what I said that Mr. Vance, I'm sorry, to be clear in regard to what Mr. Vance alluded to, when I said Mr. Porter wasn't involved, he was not an appellant on that particular appeal, which I thought was just your Honor's question. In any event, the notion that the Summer Brown email reflects a voluntary act that would make a case removable, I believe is incorrect as a matter of law in that it is not a settlement agreement under Louisiana law. It's not even a communication between the plaintiff or the plaintiff's counsel and opposing counsel. This is an email, as she indicated, to her clients. For the purpose of obtaining a conflicts waiver that would facilitate not an execution of a settlement and a dismissal of claims of airframe, but would facilitate the firm's representation of Mr. Porter adverse to ATS and subordinate the condition that the firm apparently gave to Mr. Porter in terms of whether it would represent him would be, I don't want to have a material limitation. There's not a direct adversity conflict. And I know it's been said that AeroFrame and Porter are one in the same. The magistrate judge specifically rejected that in her opinion, and I think that was correct. But she did say that the email suggests that there's an agreement sufficient to align the parties. We suggest, Your Honors, that that is too loose of a connection, that when we have developed case law in the Fifth Circuit and throughout the country where we test improper joinder or we test voluntary acts by a plaintiff that removes the defendant. Yes, Your Honor. Let me just pursue what Judge Davis mentioned before, which was that your client admitted in Tennessee that it was his decision to shut down the company. Well, I believe that what was said in Tennessee is not inconsistent with the position in the Louisiana litigation in that, and this is a problem underlying the summary judgment decision by the court below, it's ignoring the time sequence. At the time that Mr. Porter entered into his agreement with AAR, the other company, which in the Tennessee litigation is his suit against that company for breach of an employment agreement, he signed the agreement in Louisiana with AAR after learning that ATS had acquired this note, and that scuttled the deal he had with AAR. I'm sorry. May I finish my answer? That scuttled the deal that he had with AAR, and I'm sorry that I don't want to abuse the privilege to speak further, but there was a different deal, a less lucrative deal, that, yes, he did end up signing on with AAR on, but it's not inconsistent, the position he's taken in Tennessee, with regard to what he was forced to do by virtue of ATS's conduct. I see. Okay. Thank you. We have all your arguments.  Thank you, Your Honor. Thank you all.